# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-1939V

| | |
|---|---|
| DANIELLE SPILLER,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br><br>Filed: July 10, 2025 |

*John Beaulieu*, Siri & Glimstad, LLP, Louisville, KY, for Petitioner.

*Felicia Langel*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On December 30, 2022, Danielle Spiller filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a Table shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on October 30, 2021. Petition at 1. The case was assigned to the Office of Special Masters ("OSM")'s Special Processing Unit ("the SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

The parties' settlement discussions reached an impasse, and they have fully briefed entitlement and damages.³ For the reasons set forth herein, I find that Petitioner is entitled to compensation, and I award damages in the amount of **$77,566.46 (representing $75,000.00 for pain and suffering, and $2,566.46 for past unreimbursable expenses).**

## I. Factual Evidence

### A. Medical Records

Upon receiving the at-issue vaccine on October 30, 2021, Petitioner Danielle Spiller was 43 years old with a non-contributory medical history. *See, e.g.*, Ex. 2 at 5 – 6. Medical records reference her care of two children (aged 10 and 13) and work as a preschool teacher. *See, e.g.*, Ex. 4 at 98; Ex. 14 at 54, 39, 22.

Petitioner received the flu vaccine in her left deltoid, at a CVS pharmacy. Ex. 3 at 2. The next medical encounter (for any reason) occurred thirty (30) days later, on November 29, 2021, at which time she met with a sports medicine physician⁴ for a new complaint of left shoulder pain. She reported: "just over a month ago she had a flu vaccine and has had pain in the shoulder ever since… pain with laying on the shoulder and losing sleep… has los[t] AROM [active range of motion] and cannot go above 90 [degrees]… Pain is only mild at this point 3 – 4 out of 10." Ex. 4 at 55 – 56.

On physical examination, the shoulder had a painful arc of motion and positive impingement signs. Ex. 4 at 56. An x-ray was unremarkable. *Id.* The assessments were acute pain, bursitis, synovitis, impingement syndrome, and tendinitis. *Id.* at 57. The sports medicine physician prescribed a limited course of the non-steroidal anti-inflammatory drug ("NSAID") Meloxicam, encouraged formal physical therapy ("PT"), and deferred a steroid injection based on an expectation that Petitioner was "getting better." *Id.*

But on December 13, 2021, the sports medicine physician recorded that Petitioner had ongoing shoulder pain despite the trial of Meloxicam. Ex. 4 at 38. An exam found deltoid tenderness, "minimal" weakness, and positive impingement signs. *Id.* at 39. A steroid injection was administered to the subacromial bursa. *Id.* at 40.

---

³ Rule 4(c) Report filed Oct. 2, 2024, ECF No. 42; Petitioner's Entitlement Brief filed Dec. 17, 2024, ECF No. 46; Petitioner's Damages Brief filed Jan. 17, 2025; Respondent's Response filed Feb. 20, 2025, ECF No. 50; Petitioner's Reply filed Mar. 7, 2025, ECF No. 51 (accompanied by Petitioner's supplemental sworn declaration as Ex. 23, ECF No. 51-1).

⁴ This sports medicine physician had previously treated Petitioner for unrelated concerns. *See generally* Ex. 4 at 72 – 105.

2

On January 4, 2022, Petitioner reiterated that her left shoulder pain had "started after getting a flu vaccine." Ex. 5 at 5. The steroid injection had not provided "any relief"; her pain was currently "sharp" and rated 10/10. *Id.* An exam of the shoulder found tenderness, weakness (4/5), positive impingement signs, and pain in all planes of range of motion. *Id.* at 6. The sports medicine physician prescribed prednisone to "help calm down her shoulder inflammation." *Id.* at 7. He also provided home exercises and a Theraband, because "with [Petitioner's] busy schedule and being a full-time mom as well as working, she has not had time to go to" formal PT. *Id.*

On February 3, 2022, the sports medicine physician reviewed that Petitioner's pain had not been relieved by the steroid injection or oral prednisone, she was "very upset," and "this all started after the flu vaccine." Ex. 4 at 23. A focused musculoskeletal exam found pain, weakness, positive impingement signs, and "mild" restrictions to range of motion ("ROM").[5] *Id.* at 24. The physician commented that he had previously seen this kind of "post-vaccine inflammation in the shoulder." *Id.* at 25. To guide further treatment, he ordered an MRI, which visualized a small foci of bone edema and mild undersurface tearing of the supraspinatus tendon (within the rotator cuff). *Id.* at 6.

On February 15, 2022, the sports medicine physician recorded that Petitioner was still in "a lot of pain" and "really not happy with her outcome." Ex. 4 at 8. He prescribed the NSAID Celebrex (with precautions to avoid exacerbating Petitioner's underlying ulcerative colitis) and again encouraged formal PT. *Id.* at 9.

Instead on February 24, 2022, Petitioner met with a new orthopedist. Ex. 6 at 9. She recounted that her left shoulder pain had "started around the end of October," and specifically one day after her vaccination. *Id.* None of the previous treatment attempts had worked, she had lost ROM, and she could not perform previous activities of daily living ("ADLs"). *Id.* On exam, Petitioner's shoulder was diffusely tender, with restricted ROM (elevation 120 degrees, abduction 90 degrees, external and internal rotation 30 degrees)[6] but full strength and no impingement signs. *Id.* The orthopedist opined that Petitioner's primary injury was capsular tightness with potentially secondary impingement/ adhesive capsulitis. *Id.* at 10. Upon the orthopedist's administration of an intraarticular steroid injection, Petitioner reported immediate pain relief and increased ROM. *Id.* The orthopedist taught her "sleeper stretches" and also referred her for "aggressive" formal PT. *Id.* He noted on February 24th (and on subsequent dates) that

---

[5] The sports medicine physician did not document specific degrees of ROM.

[6] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, and 90 to 100 degrees in external rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 88 (F. A. Davis Co., 5th ed. 2016).

surgical intervention on Petitioner's shoulder was a possible option, but only if and when more conservative measures failed. *Id.*

At the February 28, 2022 PT initial evaluation, Petitioner noted that her left shoulder pain and ROM loss began "right away" after her October 30th vaccination. Ex. 6 at 6. The physical exam found restricted ROM (elevation 100 degrees, abduction 80 degrees, external rotation 25 degrees, internal rotation 30 degrees), and weakness (2+ to 3+/5). *Id.* Petitioner was assessed with adhesive capsulitis and instructed on home exercises which she was supposed to perform in addition to attending formal PT sessions three times a week for the next four weeks. *Id.* at 6 – 7.

At an April 7, 2022 follow-up, the orthopedist recorded: "[s]he states the shoulder felt great the day of the injection but the pain came back. The shoulder is better but not 100%. She still has problems with certain movements. She attended one PT session and then had COVID and was out of March [sic?]. She [w]as able to do some stretches at home that PT showed her. While recovering from COVID she was placed on an oral steroid[7] and that helped the shoulder pain. But since she has been off of it [the steroid] the pain is creeping back." Ex. 6 at 3. The exam findings were identical to that from six weeks earlier. *Id.* The orthopedist opined that Petitioner was "on the right track," and would continue home exercises. *Id.* at 4.

At an August 25, 2022 follow-up, the orthopedist recorded that despite Petitioner's adherence to the home exercise program, she still "[wa]sn't back to 100%." Ex. 7 at 2. The exam found improved, but still somewhat restricted ROM (elevation 150 degrees, abduction 130 degrees, external rotation 40 degrees, internal rotation 20 degrees), normal strength (5/5), full strength, and no impingement. *Id.* at 2 – 3. The orthopedist stated that Petitioner was "seeing a lot of improvement but still has a way to go," warranting continued home exercises. *Id.*

After a long treatment gap, the orthopedist recorded at an April 9, 2024 follow-up that Petitioner "doesn't feel the shoulder has ever been perfect. She has had limitations for several years now." Ex. 18 at 9. Repeat x-rays were normal, the physical exam findings were *identical*, and the orthopedist administered a glenohumeral steroid injection. *Id.* at 10 – 11.

Finally, two years and nearly seven months post-vaccination, on May 21, 2024, the orthopedist recorded that Petitioner had an ongoing left shoulder injury, with pain

---

[7] Petitioner has not filed any medical records confirming this reported infection, or its treatment with oral steroids.

4

particularly while sleeping, that was not relieved by the most recent steroid injection. Ex. 19 at 8. The physical exam findings were again identical to those at the previous two encounters. *Id.* at 8 – 9.[8] The orthopedist suggested an arthrogram prior to any consideration of surgical intervention, but no further records have been filed.

## B. Testimonial Evidence

Petitioner maintains[9] that her left shoulder pain began within 48 hours post-vaccination; after that pain persisted for several weeks, she secured an appointment with her established sports medicine physician. Ex. 1 at ¶¶ 6 – 8. She describes ongoing disruptions with activities of daily living (e.g. driving, getting dressed, sleeping on her left side), caring for her family and home, and working as a preschool teacher. She can no longer lift children or heavy objects, or lift overhead. *Id.* at ¶¶ 14 – 16; *see also* Ex. 23 at ¶¶ 2 – 4. She is concerned that the injury will never heal, or even worsen as she ages. Ex. 23 at ¶ 6. She states that the numerous pain medications and steroid injections have provided "little" relief and that the only other option is invasive surgery, but she is pessimistic that any surgery would succeed, and she has unspecified "personal reasons" for wanting to avoid it. Ex. 1 at ¶¶ 13, 17; Ex. 23 at ¶ 5. Petitioner references her March 2022 bout with COVID and continued performance of home exercises, but not the prospect of formal PT or any other treatment measures.

Petitioner's husband and her mother recall that her left shoulder pain began within a day after the October 30, 2021 vaccination. These lay witnesses also endorse the view that Petitioner has suffered ongoing pain and limitations that have not been relieved by her treatment to date. *See generally* Exs. 20, 21.

---

[8] Each record reads, in relevant part:

> Left shoulder:…
> Palpation: diffusely, tender, ant/post capsule.
> Passive ROM: There is pain with all directions of motion at the end points including ER with elbow at the side, forward elevation (deg):, 150, abduction, 130, external rotation at the side (deg):, 40, internal rotation at the side: LS jxn behind the back GIRD testing shows 20 deg IR at 90 deg abd vs. 50 deg. on the right.
> Active ROM: same as passive ROM.
> Strength testing: 5/5 in all planes within pain-free motion arc.
> Neer's impingement sign is negative.
> Hawkin's impingement sign is negative…

Ex. 7 at 2 – 3 (August 25, 2022 orthopedics physical exam); *accord* Ex. 18 at 10 (April 9, 2024) and Ex. 19 at 9 (May 21, 2024).

[9] Petitioner completed an affidavit in December 2022, Ex. 1. She submitted a statement sworn under penalty of perjury in March 2025, Ex. 23. *See* 28 U.S.C.A. § 1746 (providing that such a declaration may be afforded like force and effect as a notarized affidavit).

5

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[10] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be

---

[10] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

6

caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

7

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Factual Finding on Onset of Shoulder Pain

At issue is whether Petitioner's left shoulder pain began within forty-eight (48) hours of the October 30, 2021 vaccination. 42 C.F.R. §§ 100.3(a)(XIV)(B), (c)(10)(ii). Preponderant evidence supports such a finding.

Respondent mainly relies on the fact that medical records created close-in-time to vaccination do not expressly establish a Table onset. Response at 6. But the records contain statements uniformly relating Petitioner's shoulder pain back to the vaccination, with language that can be reasonably understood to refer to a 48-hour timeframe. *See, e.g.*, Ex. 4 at 55 ("has had pain in the shoulder ever since" vaccination); Ex. 5 at 5 (pain "started after getting a flu vaccine"); Ex. 4 at 23 ("this all started after the flu vaccine"); Ex. 6 at 9 ("received the flu shot the day before the pain started"). Such language has been *consistently* interpreted to mean "within 48 hours of vaccination." *Flowers v. Sec'y of Health & Hum. Servs.*, No. 20-285V, 2024 WL 2828211, at *11 (Fed. Cl. Spec. Mstr. May 8, 2024) (internal parentheticals and citations omitted), *mot. for rev. den'd*, 173 Fed. Cl. 613 (2024). Indeed here, Petitioner notes that "since" is defined as "a definite past time until now." Entitlement Brief at 9.[11] And what Petitioner was referring to was clearly her vaccination. Accordingly, Petitioner did in fact identify onset based on the date of vaccination as a reference point. *Id.*

Moreover, there is no evidence suggesting a shoulder pain onset anywhere *outside* of the Table timeframe, and the medical records' onset descriptions are *confirmed* by Petitioner and the two supporting witnesses' accounts. For all of the foregoing reasons, Petitioner has established a shoulder pain onset within the Table timeframe.[12]

---

[11] Citing Merriam-Webster Dictionary, *Since*, https//www.merriam-webster.com/dictionary/since (last accessed July 9, 2025).

[12] At best, Respondent (in the Rule 4(c) Report at 6) identified an apparent conflict between Petitioner's affidavit description of her initial pain being "excruciating" and the contemporaneous medical records which

8

### C. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

Petitioner's success in meeting the remaining QAI requirements is not disputed,[13] and I find that they have been preponderantly satisfied. The record does not contain preponderant evidence that Petitioner had a history of shoulder pain or any other condition that would explain her post-vaccination symptoms. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder.

The statutory requirements applicable to all claims are also preponderantly established. Petitioner received a covered vaccine in the United States. Ex. 3 at 2. She experienced residual effects of her injury for more than six months. Ex. 7 at 2 – 4. And she states that she has never received an award or settlement of a civil action for her vaccine-related injury, nor has she filed a civil action. Ex. 1 at ¶ 19. Thus, Petitioner is entitled to compensation.

## III. Pain and Suffering Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I – II of *Timberlake v. Sec'y of Health & Human Servs.*, No. 20-1905V, 2025 WL 721730 (Fed. Cl. Spec. Mstr. Feb. 19, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00," in addition to certain unreimbursable expenses resulting from the vaccine-related injury. Section 15(a)(1), (a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an

---

reflect at 30-day initial treatment delay, plus an initial pain rating of just 3 – 4/10. Those differing characterizations of the pain are more relevant to quantifying Petitioner's actual pain and suffering, which is discussed further below.

[13] Respondent does not raise any arguments concerning the remaining SIRVA Table QAI requirements or statutory requirements. *See generally* Rule 4(c) Report and Response.

award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[14]

### B. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

The evidence establishes that Petitioner's initial shoulder pain was not *so* severe to prompt immediate emergency attention – but Petitioner still promptly sought an appointment with a known sports medicine specialist, which actually occurred 30 days post-vaccination. Her pain was variable (ranging from 3 – 4/10 at the sports medicine initial evaluation, to 10/10 one month later) but persistent for months, with no lasting relief from various pain measures (over-the-counter medications, Meloxicam, and Celebrex) and steroid injections administered to two different areas of the shoulder. MRI imaging suggested a supraspinatus tendon tear. The medical records also reflect that Petitioner's obligations to her family and preschool teaching, and one bout with COVID, made it more difficult to access formal PT – but after she performed home exercises for several months, by the August 25, 2022 orthopedics follow-up, her left shoulder's ROM was somewhat improved, but still restricted. The record before me thus establishes that Petitioner's SIRVA pain and suffering was moderately severe for the first ten months.

Her subsequent course is more difficult to parse, in light of the significant treatment gap, and the recordation at her two orthopedics follow-up appointments in April and May 2024. The orthopedics records do not detail Petitioner's ongoing "limitations," carrying forward much of the clinical history, and the physical exam findings may have been copied as well (given the identical wording). Thus, the orthopedics records establish that Petitioner had *some* ongoing shoulder injury that justified a third steroid injection in April 2024 – but not that the injury remained as severe as before. Petitioner, her husband, and her mother's sworn statements do not bridge that gap – especially because they are lay witnesses, and they do not address the potential of Petitioner, for example, reattempting formal PT long after her recovery from her March 20222 COVID infection.

---

[14] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

10

Overall, Petitioner's request for $85,000.00 (*see generally* Damages Brief)[15] is not unreasonable based on the evidence and past practice. There are some distinctions with her comparable cases, however. The *Parsons* petitioner was awarded $90,000.00 even though he did not undergo surgery, because his injury was "noteworthy for its duration, spanning over five years" and it impacted his work as a veterinarian and maintaining a family farm. 2023 WL 9060490, at *9 – 10. Ms. Spiller's injury has not been documented to have lasted nearly as long, and she has been able to modify her work as a preschool teacher.

*Havis* is a better comparable. That petitioner's formal treatment began earlier (14 days post-vaccination), her MRI findings were more extensive (several tears, tendinopathy, bursitis, and degenerative changes), she attended 7 formal PT sessions, and she was wholly unable to work (performing and teaching music) during the acute course. 2024 WL 5039036, at *2 – 4. But the *Havis* petitioner received only one injection, and moreover I concluded that her "injury had substantially improved by ten months post-vaccination." *Id.* at *5. In contrast, Ms. Spiller has (somewhat) better evidence of residual effects persisting for a year and a half longer, which warranted another steroid injection (her third, in total).

Respondent proposed a much lower award of $25,000.00. Response at 7, 9, 12. But this number "factor[ed] in the deficiencies in the evidence that prevented Respondent from conceding entitlement to compensation." Response at 12.[16] That number does not recognize that the case is now formally in the damages phase.

Respondent also urges rough comparison to *Leach*,[17] followed by a downward departure, on the grounds that Ms. Spiller's SIRVA "mostly resolved" more quickly, "within about five months" – based on the April 7, 2022 orthopedics follow-up when she subjectively reported being "better but not 100%." Response at 13, referencing Ex. 6 at 3 – 4. But as noted above, Petitioner's objective improvement (specifically with ROM) was

---

[15] Citing *Parsons v. Sec'y of Health & Hum. Servs.*, No. 19-1150V, 2023 WL 9060490 (Fed. Cl. Spec. Mstr. Nov. 30, 2023) (awarding $90,000.00 for past pain and suffering); *Smith v. Sec'y of Health & Hum. Servs.*, No. 21-0409V, 2023 WL 9288086 (Fed. Cl. Spec. Mstr. Dec. 11, 2023) ($77,000.00); *Havis v. Sec'y of Health & Hum. Servs.*, No. 21-0583V 2024 WL 5039036 (Fed. Cl. Spec. Mstr. Nov. 1, 2024) ($75,000.00).

[16] My order had specified: "Each party's briefing shall set forth his or her position on whether Petitioner has established a Table SIRVA (focusing on the issue raised by Respondent), *and assuming that Petitioner so prevails, the value of the case…*" Scheduling Order entered Nov. 18, 2024, ECF No. 45 at 1 (emphasis added). In future SPU cases when I order briefing of entitlement for a Table injury, and in the event that the petitioner so prevails, the appropriate damages award, Respondent is exhorted to propose a "full-value" figure.

[17] *Leach v. Sec'y of Health & Hum. Servs.*, No. 21-0108V, 2024 WL 3358552 (Fed. Cl. Spec. Mstr. June 6, 2024) (awarding $37,500.00 for actual pain and suffering).

not documented until the next orthopedics appointment on August 25, 2022. Ex. 7 at 2 – 3. The latter is a more reliable marker. She also had a more acute course with multiple consultations attempts at pain control, more steroid injections, and more extensive MRI findings (in contrast with the *Leach* case, in which Respondent disputed whether the statutory severity requirement had been met due to a long gap in treatment).

Based on the record as a whole and the proposed comparable cases, I find that **$75,000.00** represents a fair pain and suffering award in this case.

### IV. Past Unreimbursable Expenses

Section 15(a)(1)(B) of the Vaccine Act provides that Petitioner may be awarded actual expenses which resulted from the vaccine injury, were incurred by or on her behalf, and were for the "diagnosis, medical or other remedial care, rehabilitation ... determined to be reasonably necessary."

Petitioner seeks $2,824.46 for past medical expenses. Damages Brief at 1, 9; Reply at 3 (withdrawing one expense unrelated to the vaccine injury). In arguing for reimbursement of only $618.51, Respondent raises two concerns. Response at 14. First, Respondent notes that two medical bills do not correspond to treatment for Petitioner's SIRVA. Response at 14.[18] This concern was not answered by Petitioner, *see generally* Reply, or my own independent review of the evidence, so those expenses will not be reimbursed.

Respondent also contends that Petitioner has not established her actual *payment* of several other medical expenses related to her SIRVA. Response at 12.[19] In reply, Petitioner has sworn under penalty of perjury that she does not have proof of receipt, but she has paid these expenses off as of March 7, 2025. Ex. 23 at ¶ 7. Based on her sworn statement, I find it is appropriate to include them – bringing the reimbursed medical expenses total to **$2,566.46.**

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that Petitioner is entitled to compensation for a Table SIRVA following her October 30, 2021 vaccination.**

---

[18] Citing Ex. 22 at 2 (December 17, 2021 date of service, costing $60.00); *id.* at 1 (January 3, 2022 date of service, costing $198.00).

[19] Citing Ex. 22 at 3 (patient balance of $798.07), *id.* at 7 ($981.20), *id.* at 8 ($168.68).

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $77,566.46 (representing $75,000.00 for pain and suffering[20] and $2,566.46 for past unreimbursable expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[21]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[20] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[21] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.